#26585-aff in pt, rev in pt & rem-LSW

**2013 S.D. 58**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

IN THE MATTER OF THE:
AMENDED AND RESTATED
NELSON LIVING TRUST
DATED SEPTEMBER 19, 2002, AS AMENDED.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE KATHLEEN K. CALDWELL
Retired Judge

* * * *

RICK W. ORR
JUSTIN T. CLARKE of
Davenport, Evans, Hurwitz
  & Smith, LLP
Sioux Falls, South Dakota                    Attorneys for trustee
                                             and appellant The First
                                             National Bank of Sioux Falls.


MICHAEL F. TOBIN
JENNIFER E. BUNKERS
MEGHANN M. JOYCE of
Boyce, Greenfield, Pashby,
  & Welk, LLP
Sioux Falls, South Dakota                    Attorneys for petitioner
                                             and appellee Ann Nelson.

* * * *

CONSIDERED ON BRIEFS
ON MAY 21, 2013

OPINION FILED **07/31/13**

#26585

WILBUR, Justice

[¶1.]        Ann Nelson, Decedent's ex-wife, timely filed a claim against Decedent's estate claiming entitlement to compensation for nursing and convalescent services she provided to Decedent prior to his death.  Trustee denied the claim, contending that forgiveness of a loan Decedent made to Ann constituted payment for services rendered.  Ann then filed a Petition for Allowance of Claim, alleging breach of contract and unjust enrichment and seeking payment from Decedent's trust in the amount of $270,045.  Based on surrounding circumstances and statements ascribed to Decedent, the trial court concluded that Ann was entitled to compensation, and ordered that the trust pay her $183,538 for services she provided to Decedent.  We affirm the trial court's conclusion that Ann was entitled to compensation for the services she provided to Decedent, but remand to the trial court with instructions to recalculate the award consistent with this opinion.

## FACTS AND PROCEDURAL HISTORY

[¶2.]        Ann Nelson and Dr. Robert E. Nelson were married on May 9, 1987.  The couple divorced approximately ten years later.  After the divorce, Ann purchased a nine-acre farmstead and a thirty-five acre parcel of land, which were located approximately thirty-five miles west of Sioux Falls and nine miles north of Parker (the "farmstead").  Although they were divorced, Ann and Dr. Nelson remained friends.  They often had dinner together, and Dr. Nelson helped Ann restore the farmstead.  Dr. Nelson frequently visited the farmstead, and he and Ann took great pride in the work that they had done to restore it.

[¶3.]     When Ann purchased the farmstead, an adjoining forty-five acre parcel of land (the "adjoining parcel") was also available, but she did not purchase it. Approximately one year after Ann purchased the farmstead, she had a second opportunity to purchase the adjoining parcel. Although she submitted a bid, she was not successful in purchasing the adjoining parcel at that time. Ann and the new owner of the adjoining parcel later came to a verbal understanding that if he were to sell the property, he would afford Ann the first opportunity to purchase it.

[¶4.]     Despite this verbal understanding, Ann discovered on September 16, 2007, that the adjoining parcel was to be auctioned off in thirty days. A few days later, while having dinner with Dr. Nelson, Ann brought the upcoming auction to his attention. At that time, Ann asked Dr. Nelson whether he would "go halfsies on it," meaning that he would help Ann pay for the adjoining parcel and that they would jointly own it. Dr. Nelson responded, "[L]et me think about it."

[¶5.]     Approximately a week later, while having dinner at the farmstead, Ann and Dr. Nelson discussed the upcoming auction of the adjoining parcel. Dr. Nelson asked Ann the amount of the mortgage against the farmstead. Upon learning that Ann did not owe anything on the farmstead and that she had approximately $40,000 to put toward the purchase of the adjoining parcel, Dr. Nelson indicated he would loan Ann the difference between the amount of money that she could contribute and the purchase price. Dr. Nelson further indicated that Ann need only pay him interest on the loan and that any balance that remained upon his death would be forgiven:

> **Q:** Did he make any other statements about what may happen to this loan at some point in time?

**A:** Yes, he did. He followed that up.

**Q:** What did he say?

**A:** He said, and then I have to decide what to do if I should die, meaning him. And he said, I have decided that you should have it.

[¶6.] On October 3, 2007, Dr. Nelson decided to undergo back surgery. Dr. Nelson called Ann on October 8, 2007 to inform her that he was scheduled to have back surgery on October 10, 2007. When Ann expressed concern about his ability to attend the upcoming auction, which was scheduled on October 13, 2007, Dr. Nelson assured her that the surgery was "not a big deal." Dr. Nelson explained that he would be discharged from the hospital on October 12, 2007, and that he intended to attend the auction. Dr. Nelson believed that the back surgery would be a simple procedure and that he would be fully capable of caring for himself after it. However, Dr. Nelson did not recover as fast as expected, and on October 12, 2007, Richard Lauer, Sr., Dr. Nelson's financial planner and adviser, informed Ann that Dr. Nelson would not be able to attend the upcoming auction.

[¶7.] Ann attended the auction and was the successful bidder on the adjoining parcel. On the day of the auction, she signed a real estate purchase agreement and provided a ten-percent down payment. The purchase price was $161,383, and the closing of the transaction was scheduled to take place on November 13, 2007. Ann immediately informed Dr. Nelson that she was the successful bidder.

[¶8.] On October 19, 2007, Dr. Nelson returned to his home. Ann drove Dr. Nelson from Covington Heights, where he underwent rehabilitation, to his home. Because Dr. Nelson believed he was independent enough to care for himself, Ann

returned home. She did not speak to Dr. Nelson until October 21, 2007, when she received a phone call from him indicating that he was very sick and needed her to come to his house quickly. Ann headed to Sioux Falls. Upon arriving at Dr. Nelson's home, Ann and Dr. Richard Hosen, a friend of Dr. Nelson's, transported Dr. Nelson to Avera McKennan Hospital.

[¶9.] Dr. Nelson was diagnosed with pneumonia and sepsis and was admitted to the Intensive Care Unit (ICU). During his stay in the ICU, Dr. Nelson asked Ann if he could hire her to move in with him and take care of him until he recovered. Ann agreed. Dr. Nelson and Ann did not discuss the length of her service or the rate of her pay. The next day, Dr. Nelson informed his son, Robert Nelson, about this arrangement: "Rob, I am going to hire Annie to take care of me. I can't do it by myself. I'm going to need help. She knows how to do it. She knows how to manage the house, run the house and manage the dogs, and I don't want a bunch of strangers around." On October 26, 2007, with the understanding that Ann would be caring for Dr. Nelson upon his return home, Avera discharged Dr. Nelson.

[¶10.] On October 30, 2007, Dr. Nelson and Ann met with Jayna Voss,[1] an estate planning attorney, to finalize the loan documents between them. Voss first met with Dr. Nelson. Dr. Nelson informed Voss that he wanted to loan Ann money and wanted to amend the Robert E. Nelson Trust (the "Trust") to forgive the loan upon his death. Voss then met with Dr. Nelson and Ann. During the meeting, they discussed the amount of the loan, the interest rate, repayment period, and method of repayment. They determined that the amount of the loan related to the purchase

---

1. Voss did not have a prior relationship with either Dr. Nelson or Ann.

of the adjoining parcel would be $125,000 at 4.89 percent interest for a fifteen-year term.

[¶11.]     Dr. Nelson also mentioned that Ann would be taking care of him because he was in poor health. Because the monthly payment on the loan was approximately $1,000 and because Dr. Nelson could gift Ann up to $12,000 per year without any gift tax consequences, they considered the option of Dr. Nelson gifting Ann $12,000 a year to repay the loan. They also discussed the possibility of a personal services contract whereby Ann would use the money that Dr. Nelson paid her to pay the loan. Ultimately, Ann and Dr. Nelson decided not to enter into a personal services contract.[2] In fact, they reached no agreement regarding the repayment options.

[¶12.]     On November 1, 2007, Ann and Dr. Nelson returned to Voss's office to sign the promissory notes.[3] Voss wrote a memo to the file on November 9, 2007, regarding the October 30, 2007 and November 1, 2007 meetings. The memo provided in part that "[Dr. Nelson and Ann] informed me that they intended that Ann take care of Dr. Nelson and that he would likely make annual gifts to her so that she can pay the loan[,]" but the note does not otherwise mention Ann's services.

---

2.     Ann disliked the personal services contract option because it would require her to pay income tax.

3.     Ann and Dr. Nelson could not decide on a monthly or yearly payment obligation. As a result, Ann and Dr. Nelson directed Voss to prepare two promissory notes, one requiring monthly payments and the other requiring yearly payments. The monthly note required payment beginning December 1, 2007, while the yearly note required payment beginning December 1, 2008. Ann and Dr. Nelson were then to decide which option they desired, which they never did. We refer to the promissory notes as the "Note."

[¶13.]     Following execution of the Note, Ann received a check from the Trust for $125,000 payable from First National Bank.  The check contained the following description: "Gift to Ann Marie Nelson from Robert E[.] Nelson[.]"  Ann then used the funds to close on the purchase of the adjoining parcel.

[¶14.]     For the next year, Ann cared for Dr. Nelson until his unexpected death on October 15, 2008.  At the time that Ann was caring for Dr. Nelson, he was suffering from diabetes, Hepatitis C, autoimmune Hepatitis, ecchymosis,[4] and edema.[5]  According to Ann, she was responsible for coordinating the care that Dr. Nelson was receiving from a variety of specialists in Sioux Falls and Minneapolis.  She scheduled Dr. Nelson's doctor appointments, filled out necessary paperwork in advance of his appointments, followed up with doctor's requests, transported him to his appointments, and attended his appointments with him.  She also coordinated Dr. Nelson's physical therapy, x-ray, and lab work appointments.  Additionally, Ann was responsible for managing Dr. Nelson's various medications, including filling his prescriptions, administering them, and monitoring his dosages.  Ann also performed nursing assessments and cleaned and dressed surgical wounds, torn skin, and tissue.  Finally, Ann attended to Dr. Nelson's personal cares, including bathing, toileting, laundry, cleaning, dressing, grocery shopping, cooking, paying bills, and caring for his pets.

[¶15.]     Following Dr. Nelson's death, Ann submitted an invoice to the Trust, requesting reimbursement for the services that she provided to Dr. Nelson in the

---

4.     Ecchymosis is a bruising of the extremities and thinning of the skin tissue.

5.     Edema is a swelling of the legs, ankles, and feet, or upper extremities.

last year of his life. On February 19, 2009, Trustee responded to Ann's request, stating that, without a directive from Dr. Nelson, it could not pay the invoice that Ann submitted. In a later letter dated March 24, 2009, Trustee informed Ann that forgiveness of the Note was intended as payment for the services that she provided to Dr. Nelson. Ann subsequently filed a Petition for Allowance of Claim, alleging breach of contract and unjust enrichment, and seeking payment from the Trust in the amount of $270,045 for the services she provided to Dr. Nelson.

[¶16.] A court trial was held on June 14 and 15, 2012. At trial, Ann testified that while she was caring for Dr. Nelson, he made several statements regarding his need to compensate her for her services. For example, at an art show at the Downtown Holiday Inn in February 2008, Dr. Nelson told several of his friends and acquaintances that he was not recovering well from his surgery and that "he had hired [Ann] to take care of him." Subsequently, while driving home from Minneapolis after a second back surgery in August 2008, Dr. Nelson said to Ann, "Annie, I know I owe you a lot of money, but we'll settle up when I get better. . . . [A]nd this is good, because this will be your retirement. You can use this for your retirement." Finally, just days before Dr. Nelson passed away, he said to Ann, "Sweetie, I know I owe you a lot of money, but we will settle this. But if you can just hang in there a little while longer until I work myself through this, I will pay you, and will you just stay."

[¶17.]        Lawrence L. Piersol,[6] a neighbor and friend of Dr. Nelson's, also testified that Dr. Nelson made several statements to him regarding his need to compensate Ann for her services.  For example, in October 2007, Dr. Nelson commented to Piersol: "I've got to take care of Ann because . . . if it weren't for her, . . . I'd be in a nursing home."  Again, on September 21, 2008, Dr. Nelson told Piersol that he "had to do something to compensate Ann for the care that she was giving him."  And, during a conversation with Dr. Hosen on September 22, 2008, concerning Ann's care of Dr. Nelson, Piersol took the following note: "He has not put her on any income – land separate from him."  Piersol testified that it was his impression that Dr. Nelson needed to pay Ann for her services, but also that he had not paid her anything thus far:

> **Q:** Just to follow up on that, from your conversation with Dr. Nelson on September 21, 2008, at his home, whether the word "compensate" was used or not, you were certainly left with the impression and understanding that Dr. Nelson needed to pay or reward Ann in some manner for the care that she had provided to him for the past several months?
>
> **A:** I had no question about that, that was what he meant with what he said.
>
> . . .
>
> **Q:** In that conversation with Dr. Nelson on September 21st at his home in 2008, you already indicated that you were left with the clear impression that Dr. Nelson needed to do something along the lines of paying or compensating Ann. Was it also your understanding that he had thus far not paid her anything?
>
> **A:** Yes.  That was my understanding.

---

6.        Lawrence L. Piersol, a United States District Judge for the District of South Dakota, did not testify in his official capacity, but rather, testified as a fact witness during this proceeding.

[¶18.] Voss testified that when Dr. Nelson and Ann came in to finalize the loan documents, Dr. Nelson indicated that "he intended to loan [Ann] one hundred twenty-five thousand for the purchase of the real estate[,]" and that "he either intended to pay her for [her] services or to forgive – forgive the [N]ote." According to Voss, it was her impression that the Note's forgiveness was related to Ann's services:

> **Q:** And is there any doubt in your mind that the purpose of this loan to purchase the land was in exchange for Ann's services to Dr. Nelson?
>
> **A:** The purpose of the loan was to purchase real estate, but what went with it, is the fact she was going to be providing services and then that is how the note would be forgiven.
>
> **Q:** So there was a relationship between the two?
>
> **A:** Yes.

[¶19.] Lauer also testified concerning a conversation he had with Dr. Nelson in October 2007, wherein Dr. Nelson informed Lauer he was going to loan Ann $125,000, and that, based on this conversation, it was Lauer's impression that the Note's forgiveness and Ann's services were related:

> **Q:** And just in your own words and as best you can recall, exactly what did he say?
>
> **A:** Okay, He had – he came in that day. . . . And he had said he had been down to the bank and was going to make a loan to Ann that would be forgiven at his death. So he had wanted her to be able to acquire this farm property. And then he went on to say that Ann was going to take care of him.
>
> . . .
>
> **Q:** And there is no doubt in your mind that it was, at least from your perspective, that it was his intention that these two things be a quid pro quo for one another?
>
> **A:** That – is my impression of it. And in looking at him, and the way he was saying this, that we were going to do this loan,

and she's going to move in, that was my impression, that it was a quid pro quo.

[¶20.] Rob[7] also testified that shortly after Dr. Nelson's first back surgery, Dr. Nelson told Rob that "he was going to hire Ann for an amount of money roughly equivalent to what it would cost to be in a nursing home, on the order of seven thousand dollars a month, in exchange for Ann being around and helping him out." Approximately, one to two months later, Dr. Nelson informed Rob that he had loaned Ann $125,000 to buy the adjoining parcel and that he had amended the Trust to forgive the loan upon his death. Based upon that conversation, Rob's impression was that "[Dr. Nelson] had amended the Trust to forgive the loan when he died in exchange for [Ann] helping him out."

[¶21.] Finally, Charis Poppens, a registered nurse who worked for Sanford Home Health Services for 26 years, testified concerning the value of Ann's services. Poppens performed a detailed review of the December 9, 2008 invoice that Ann submitted to Trustee and the services that she provided to Dr. Nelson. Poppens allocated the care that Ann provided to Dr. Nelson among three categories: (1) registered nurse care, (2) nurse aide care, and (3) companion care. Using the charges that Sanford Home Health would have charged if Dr. Nelson had employed an in-home healthcare agency, Poppens determined that Ann provided Dr. Nelson one hour of registered nurse care each day at the rate of $75.00 per hour, four hours of nurse aide care each day at the rate of $35.00 per hour, and nineteen hours of

---

7. Rob is the beneficiary of the Trust and is currently living in Dr. Nelson's home. All costs associated with the house are covered by the Trust. Currently, the Trust does not have enough cash to pay for Ann's services and the house would likely have to be sold to cover these costs.

companion care each day at a rate ranging from $15.00 to $18.00 per hour. Poppens testified that, according to her calculation, if Dr. Nelson had hired Sanford Home Health to care for him, it would have cost Dr. Nelson $189,295.

[¶22.]     On November 28, 2012, the trial court entered findings of fact, conclusions of law, and an order, concluding that Ann was entitled to compensation for the services she provided to Dr. Nelson. In calculating the value of the services Ann rendered, the trial court determined that Ann cared for Dr. Nelson twenty-four hours a day for 350 days and 343 nights.[8] Using the prices Sanford Home Health charges for in-home healthcare, the trial court then calculated the value of Ann's services for those days and nights, accounting for the type of care she provided as well as overnight and weekend rates. The court ultimately concluded that Ann was entitled to $183,538 for the services she provided to Dr. Nelson. A judgment was subsequently entered on December 14, 2012, in favor of Ann in the amount of $259,768.88, including pre-judgment interest. Trustee appeals, raising the following issues:

1.    Whether the trial court erred in finding that the purpose of the Note's forgiveness and its subsequent forgiveness did not constitute compensation for the services Ann provided to Dr. Nelson.

2.    Whether the trial court erred in finding that Ann established, by clear and convincing evidence, that she was entitled to compensation for the services she provided to Dr. Nelson.

3.    Whether the trial court erred in finding that the value of the services Ann provided to Dr. Nelson was $183,538.

---

8.    The trial court deducted five days when Dr. Nelson attended hunting trips and eight nights when Dr. Nelson's housekeeper stayed with him.

4. Whether the trial court erred, as a matter of law, in failing to consider circumstances surrounding the Note's creation.

## STANDARD OF REVIEW

[¶23.] We review a trial court's conclusions of law de novo. *Eagle Ridge Estates Homeowners Ass'n, Inc. v. Anderson*, 2013 S.D. 21, ¶ 13, 827 N.W.2d 859, 864-65. Findings of fact are reviewed under the clearly erroneous standard. *Id.* ¶ 12. A finding is clearly erroneous when, after reviewing the entire record, we are left with a definite and firm conviction that a mistake has been made. *Id.* "[T]he credibility of the witnesses, the import to be accorded their testimony, and the weight of the evidence must be determined by the trial court, and we give due regard to the trial court's opportunity to observe the witnesses and examine the evidence." *Id.* (alteration in original).

## ANALYSIS AND DECISION

*Purpose of the Forgiveness of the Note*

[¶24.] Trustee argues that the trial court erred in finding that the purpose of the Note's forgiveness and its subsequent forgiveness did not constitute compensation for the services Ann provided to Dr. Nelson.[9] Trustee claims the

---

9. Trustee contends this issue presents a mixed question of law and fact and, thus, must be reviewed under the de novo standard of review. *See Manuel v. Toner Plus, Inc.*, 2012 S.D. 47, ¶ 8, 815 N.W.2d 668, 670 (explaining that a mixed question of law and fact that requires the Court "to consider legal concepts in the mix of fact and law and to exercise judgment about the values that animate legal principles" is one of law and should be reviewed de novo). We disagree. The question of whether forgiveness of the Note was compensation for Ann's services required the court to resolve disputed facts. It did not require the court to "consider legal concepts in the mix of fact and

(continued . . .)

-12-

court ignored its evidence establishing that Ann agreed to care for Dr. Nelson in exchange for the Note's forgiveness. According to Trustee, "[t]he overwhelming evidence at trial supports [such a] conclusion."

[¶25.] In this case, Trustee presented testimony and evidence at trial that the purpose of the Note's forgiveness and its subsequent forgiveness was to compensate Ann for the services she provided to Dr. Nelson. For example, Voss testified that she had no doubt that a relationship existed between the Note's forgiveness and Ann's services. She stated: "The purpose of the loan was to purchase the real estate, but what went with it, is the fact [Ann] was going to be providing services and then that is how the [N]ote would be forgiven." Similarly, Lauer testified that he believed Dr. Nelson intended to forgive the Note in exchange for Ann's services because "[Dr. Nelson] came in and he was basically sharing these two items and said them basically back-to-back." Rob also testified that his impression was that Dr. Nelson chose to forgive the Note upon his death in exchange for Ann "helping him out."

[¶26.] Ann, by contrast, presented testimony and evidence at trial that the Note's forgiveness and her services were not related. Ann testified that prior to Dr. Nelson's back surgery, they had a conversation in which Dr. Nelson told Ann he decided to forgive the loan upon his death. Ann also testified that she and Dr. Nelson never discussed compensation, and, more importantly, never discussed

---

(. . . continued)
> law and to exercise judgment about the values that animate legal principles."
> *See id.* Thus, we decline to apply a de novo standard of review, and, instead,
> review the court's findings of fact on this issue under the clearly erroneous
> standard.

whether the Note's forgiveness was her compensation when they agreed that he would hire her to care for him. Further, Ann presented evidence that Dr. Nelson told Piersol he needed to compensate Ann for her services and that in a September 22, 2008 phone conversation with Dr. Hosen concerning Ann's care of Dr. Nelson, Piersol took the following note: "He has not put her on any income – land separate from him."

[¶27.] In determining whether the Note's forgiveness and Ann's services were related, the trial court also examined the $125,000 check Ann received from the Trust, which included a notation describing the check as a "[g]ift to Ann Marie Nelson from Robert E[.] Nelson[.]" The court also examined the language of the Trust amendment, which indicates that the Note's forgiveness was a gift. The Trust Amendment provides, in relevant part:

> It is my intent that the loan owed by [ANN MARIE NELSON] to the Trust be forgiven at my death, and that ANN MARIE NELSON no longer be obligated to pay said Note to the Trust or my estate. If ANN MARIE NELSON shall predecease me, then this *gift* shall lapse, and the Note shall be fully enforceable against ANN MARIE NELSON's estate.

(Emphasis added.) The court found that the Trust amendment "clearly states that the loan forgiveness is a gift to Ann upon Dr. Nelson's death, and that the gift will lapse if Ann predeceases Dr. Nelson." The court also found that the Trust amendment allows the Trust to enforce the Note against Ann's estate if Ann predeceased Dr. Nelson, which is significant because Ann's estate would not receive any compensation from Dr. Nelson for the services Ann provided to him during her lifetime if the Note's forgiveness and her services were in fact related.

[¶28.] The trial court carefully considered and weighed all the evidence and testimony presented concerning the Note's forgiveness, and ultimately found that the Note's forgiveness was "not compensation for the services [Ann] rendered during Dr. Nelson's lifetime." The court was in the best position to weigh the conflicting evidence, and we will not overturn the trial court's factual findings unless we are left with a definite and firm conviction that a mistake has been made. The court's findings are based on record evidence. Trustee has not demonstrated that a mistake has been made. The trial court's finding that the purpose of the Note's forgiveness and its subsequent forgiveness was not compensation for the services Ann provided to Dr. Nelson was not clearly erroneous.

*Ann's Entitlement to Payment for Services Rendered*

[¶29.] Trustee argues the trial court erred in finding that Ann established, by clear and convincing evidence, that she was entitled to compensation for the services she provided to Dr. Nelson. "Claims against estates for personal services rendered to decedents require proof by clear and convincing evidence." *In re Regennitter*, 1999 S.D. 26, ¶ 11, 589 N.W.2d 920, 923. "This high standard is imposed, as claims of this nature must be closely scrutinized, being objects of suspicion, and must be established by greater quantum of proof than in ordinary actions." *In re Estate of Dimond*, 2008 S.D. 131, ¶ 11, 759 N.W.2d 534, 538.

[¶30.] Again, Trustee alleges that the trial court incorrectly weighed the evidence and should have given more weight to its evidence. Trustee claims Ann's testimony has little evidentiary value because it was uncorroborated and self-serving. To support its position, Trustee cites *Martinson v. Holso*, 424 N.W.2d 664

(S.D. 1988) and *Mahan v. Mahan*, 80 S.D. 211, 121 N.W.2d 367 (1963). In *Mahan*, this Court explained that "testimony as to oral statements allegedly made by deceased persons is regarded as the weakest kind of evidence." 80 S.D. at 215, 121 N.W.2d at 369. Further, in *Martinson*, we explained that self-serving testimony concerning statements allegedly made by a deceased person "is alone insufficient and must be corroborated." 424 N.W.2d at 668.

[¶31.] The trial court was confronted with conflicting evidence. Voss, Lauer, and Rob all testified that they believed the Note's forgiveness and Ann's services were related. Ann, on the other hand, testified that while Dr. Nelson was in the ICU in October 2007, he asked her if he could hire her to move in with him and take care of him until he recovered. She also testified that on at least two occasions, Dr. Nelson acknowledged that he owed her a lot of money, but reassured her they would "settle up" when his health improved. Moreover, Ann testified that at an art show in February 2008, Dr. Nelson told several friends and acquaintances that he had hired Ann to take care of him. Likewise, Piersol testified that Dr. Nelson occasionally mentioned that he had to compensate Ann for the services she provided to him. Even Rob testified that Dr. Nelson informed him he was going to hire Ann for an amount equivalent to that of nursing home care.

[¶32.] "With conflicting testimony from numerous witnesses, we defer to the trial court to weigh the evidence and judge the credibility of the witnesses." *McCollam v. Cahill*, 2009 S.D. 34, ¶ 9, 766 N.W.2d 171, 175. After examining the evidence and observing the witnesses, the court was persuaded by the credibility and weight of Ann's evidence and resolved conflicting evidence in her favor. Thus,

we hold that the court's acceptance of Ann's testimony and its finding that she established entitlement to payment by clear and convincing evidence are not clearly erroneous.

*Value of Services Rendered*

[¶33.]     The trial court found Ann provided twenty-four-hour-a-day care from October 27, 2007 to October 15, 2008, excluding five days when Dr. Nelson attended hunting trips and eight days when his housekeeper cared for him.  Using the prices Sanford Home Health charges for in-home healthcare, the court determined that the value of the services Ann provided to Dr. Nelson was $183,538.  Trustee argues that the court's valuation of the services Ann provided to Dr. Nelson was clearly erroneous.  Trustee contends the court erred in finding that Ann provided twenty-four-hour-a-day care.  In the alternative, Trustee contends the court erred in finding that Ann provided twenty-four-hour-a-day care on October 13 to 15, 2008 when Dr. Nelson was hospitalized in the ICU.  "Value is a question of fact[.]"  *W. Two Rivers Ranch v. Pennington Cnty.*, 549 N.W.2d 683, 685 (S.D. 1996).  Therefore, we will not overturn the court's valuation of the services Ann provided to Dr. Nelson unless it is clearly erroneous.  *See id.*

[¶34.]     We first address Trustee's assertion that the trial court erred in determining Ann provided twenty-four-hour-a-day care.  Trustee contends the evidence at trial strongly suggested that Ann did not provide twenty-four-hour-a-day care because Dr. Nelson frequently went to coffee and lunch with friends, Dr. Nelson attended several hunting trips with friends, Ann continued to run her dog-grooming business while she cared for Dr. Nelson, and Ann and Dr. Nelson agreed

Ann could occasionally return to her farmstead to care for her property and horse. Trustee, however, did not submit evidence showing the hours Ann did not render services to Dr. Nelson because he was either at coffee or lunch with friends or she was at the farmstead. The court deducted the dates Dr. Nelson attended hunting trips from its award, which was the only evidence Trustee submitted concerning the hours Ann did not render services to Dr. Nelson.

[¶35.]        Moreover, because companion care includes preparing meals, doing laundry, cleaning, and caring for pets, for example, Ann could have provided companion care even when Dr. Nelson was not home. Further, Poppens testified that companion care also requires the caregiver to "[j]ust kind of be there . . . to make sure things are going well." Thus, contrary to Trustee's contention, nothing in the record suggests that Ann could not provide companion care while attending to her dog-grooming business. After all, Dr. Nelson agreed that Ann could keep the dogs she was caring for at his house, which included a dog-grooming room. Finally, Trustee did not challenge Ann's evidence concerning the value of her services by offering competing expert testimony. The trial court's findings were based on record evidence. Therefore, Trustee has not demonstrated that the court clearly erred in determining that Ann provided Dr. Nelson twenty-four-hour-a-day care.

[¶36.]        Next, we address Trustee's assertion that the trial court erred in determining Ann provided twenty-four-hour-a-day care on October 13 to 15, 2008 when Dr. Nelson was hospitalized in the ICU. Trustee contends that Ann could not have cared for Dr. Nelson twenty-four hours a day while he was in the ICU. Ann undoubtedly did not provide twenty-four-hour-a-day care to Dr. Nelson while he

was being cared for by the ICU physicians, nurses, and staff. The court clearly erred in finding that Ann provided twenty-four-hour-a-day care to Dr. Nelson on October 13 to 15, 2008. We therefore remand to the trial court with instructions to deduct the compensation related to these days from its award.

*Evidence Concerning Circumstances Surrounding the Note's Creation*

[¶37.] When a contract is plain and unambiguous, "[t]he parol evidence rule bars extrinsic evidence or prior negotiations offered to contradict or supplement a written contract" because the intent of the parties can be derived from within the four corners of the contract. *Kernelburner, L.L.C. v. MitchHart Mfg., Inc.*, 2009 S.D. 33, ¶ 7, 765 N.W.2d 740, 742; *Hofeldt v. Mehling*, 2003 S.D. 25, ¶ 11, 658 N.W.2d 783, 787. However, "[t]he surrounding circumstances from which a contract stems are to be considered when interpreting its provisions." *Mitzel v. Hauck*, 78 S.D. 543, 547, 105 N.W.2d 378, 380 (1960) (citing *Unke v. Thorpe*, 75 S.D. 65, 69, 59 N.W.2d 419, 422 (1953)).

[¶38.] The trial court found that the language of the Note was plain and unambiguous and concluded that the parol evidence rule applied. Trustee does not dispute the court's conclusion. However, Trustee alleges that because the court applied the parol evidence rule, it did not consider the circumstances surrounding the Note's creation, which Trustee contends was an error of law. In support of its position, Trustee alleges the trial court failed to include the complete and accurate testimony of Voss, Lauer, and Rob. Trustee, however, does not provide additional support for its argument. For example, Trustee does not identify any inaccuracies

in the court's findings of facts or conclusions of law nor specify what circumstances the court failed to consider in its findings of fact and conclusions of law.

[¶39.] Contrary to Trustee's argument, the trial court's findings of fact are replete with the details of the circumstances surrounding the Note's creation. Based upon our review of the record, the court made at least eighteen specific findings of fact concerning discussions about the Note's creation. Because the record reveals that the court considered circumstances surrounding the creation of the Note, Trustee's bare assertion, absent further support, is without merit. We therefore hold that no error of law existed because the trial court considered circumstances surrounding the Note's creation.

## CONCLUSION

[¶40.] The trial court considered the circumstances surrounding the Note's creation and thus did not err as a matter of law. In addition, the court did not clearly err in finding that the purpose of the Note's forgiveness and its subsequent forgiveness was not compensation for the services Ann provided to Dr. Nelson, that Ann established entitlement to payment by clear and convincing evidence, and that Ann provided Dr. Nelson twenty-four-hour-a-day care from October 27, 2007 to October 12, 2008. However, the court's finding that Ann provided Dr. Nelson twenty-four-hour-a-day care from October 13 to 15, 2008, while Dr. Nelson was hospitalized in the ICU is clearly erroneous. We therefore affirm in part, reverse in part, and remand to the trial court with instructions to recalculate the award consistent with this opinion.

#26585

[¶41.]    GILBERTSON, Chief Justice, and KONENKAMP and ZINTER Justices, and MACY, Circuit Court Judge, concur.

[¶42.]    MACY, Circuit Court Judge, sitting for SEVERSON, Justice, disqualified.