#27388-a-LSW

**2016 S.D. 4**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

ESTATE OF JACQUELYN CARD,                 Plaintiff and Appellee,

    v.

CURTIS CARD,                               Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SEVENTH JUDICIAL CIRCUIT
FALL RIVER COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE ROBERT A. MANDEL
Judge

* * * *

PATRICK M. GINSBACH of
Farrell, Farrell & Ginsbach, PC
Hot Springs, South Dakota                  Attorneys for plaintiff
    and appellee.


DAVID L. CLAGGETT of
Claggett & Dill Prof., LLC
Spearfish, South Dakota                    Attorneys for defendant
    and appellant.

* * * *

CONSIDERED ON BRIEFS
ON NOVEMBER 30, 2015

OPINION FILED **01/13/16**

#27388

WILBUR, Justice

[¶1.]　　　　Decedent opened a savings account in 1989 and, in 2007, included her son and daughter as additional account owners.  When decedent passed away in 2012, son withdrew his share of the account balance relying on SDCL 29A-6-104, which provides that the proceeds of a joint account automatically pass to the surviving account holder.  The estate brought suit against son to recover the amount he withdrew.  The estate asserted that it rebutted the presumption under SDCL 29A-6-104 that the proceeds automatically pass to the surviving account holder because decedent created the savings account for her and her husband's benefit.  After a bench trial, the court ruled that the estate rebutted the presumption with clear and convincing evidence that decedent did not intend to create a joint account with right of survivorship.  Son appeals.  We affirm.

## Background

[¶2.]　　　　Jacquelyn Card died on October 28, 2012, in her daughter's home in Virginia.  She was survived by her husband Darrell and their four adult children: Curtis, Kathleen, Craig, and David.  Jacquelyn and Darrell had been married for 65 years at the time of her death.  They lived in various locations throughout their marriage, settling in Hot Springs in 1979.  Jacquelyn worked as a teller at a local bank until she retired in 1990.  Darrell also worked at a bank, until it sold in 1985.

[¶3.]　　　　In 1989, Jacquelyn's mother left her a substantial inheritance.  The amount of the inheritance is not known.  Kathleen testified that she believed it was near $100,000.  Curtis claimed Jacquelyn inherited approximately $680,000.  Nonetheless, it is undisputed that Jacquelyn placed the inheritance in a savings

-1-

account separate from Darrell. Darrell had a history of managing money poorly, and Jacquelyn's family described her to be financially conservative. When Jacquelyn created the account in 1989, she asked Curtis if he would place his name on the account with hers. Curtis agreed, and Jacquelyn and Curtis signed a signature card for savings account #1683 at First Western Bank (1989 Account). The signature card did not indicate whether the account was a joint tenancy, trust, or tenancy in common. Curtis testified that his mother wanted his name on the account so "if anything happened to her, that somebody would be on there so the money would flow to them," referring to Darrell and Jacquelyn.

[¶4.] In 1994, Jacquelyn executed a Will without the assistance of an attorney. The Will provided:

> I give, devise and bequeath unto my children, Curtis L. Card, Kathleen M. Card, Craig A. Card and David A. Card, all my interest in and to all the property of which I die seized, possessed or entitled to, the same to be their sole and absolute property in fee simple forever, be the property real property, personal property, or mixed, in equal and undivided interests, share and share alike, with the stipulation that my husband, Darrell E. Card, have full use, control and enjoyment of the properties and all the income therefrom, during his lifetime.

Also in 1994, Jacquelyn asked Kathleen to act as personal representative for her estate. According to Kathleen, Jacquelyn did not trust Curtis to carry out Jacquelyn's wishes upon her death. Curtis, however, described his relationship with Jacquelyn as "close[.]"

[¶5.] In 2007, Jacquelyn and Darrell began spending the colder months in Virginia living with Kathleen. According to Kathleen, Jacquelyn told her that Curtis asked that his name be removed from the 1989 Account so he could avoid

potential tax liability. Curtis denied that he ever asked to be removed from the account. Kathleen further claimed that Jacquelyn asked if Kathleen would place her name on the account instead of Curtis. Kathleen agreed, and in October 2007, Kathleen and Jacquelyn executed a new signature card at First Western Bank for savings account #3200001623 (2007 Account). Curtis also executed a new signature card for the 2007 Account. He testified that his mother told him he needed to sign the new card because the bank was assigning a new number to the savings account.

[¶6.] The signature card for the 2007 Account designated the account as a joint account with right of survivorship and listed the "Account Holder Name(s):" as "JACQUELYN J CARD, CURTIS CARD or KATHLEEN M CARD." From 2007 until Jacquelyn's death in 2012, Jacquelyn and Darrell continued to spend the colder months living with Kathleen. After Jacquelyn died, Darrell remained in Virginia until Kathleen and her siblings determined that Darrell needed long-term care. Kathleen and Darrell returned to Hot Springs in May 2013, and Darrell moved into an assisted living facility. Kathleen intended to continue to use Jacquelyn's assets to provide for Darrell's care.

[¶7.] In June 2013, Kathleen instituted formal probate proceedings. It was at this time that Kathleen learned that the 2007 Account was a joint account with right of survivorship. She informed Curtis. According to Kathleen, Curtis responded that he was unaware that his name was on any of Jacquelyn's accounts. Kathleen further claimed that upon her request Curtis agreed to disclaim his interest in the account. Curtis disputed this and contended that he believed Kathleen was speaking to the interest generated by the account, not his ownership

interest in the account balance.  When Jacquelyn died, the 2007 Account had a balance of $35,107.87.  After Kathleen and Curtis exchanged emails on June 5, 2013, related to Curtis's interest in the 2007 Account, Curtis informed Kathleen that he had visited with an attorney and intended to remove his share of the proceeds from the 2007 Account.  On June 20, 2013, Curtis withdrew $17,553.94 from the 2007 Account and placed the funds in a certificate of deposit in his name.

[¶8.]     In July 2013, the Estate of Jacquelyn Card brought a civil suit against Curtis.  The Estate alleged that Jacquelyn placed her inheritance in the 2007 Account "in an implied trust for the benefit of [herself] and her husband Darrell Card."  The Estate further claimed that Curtis "converted $17,553.94" for "his own personal use."  The Estate requested a judgment against Curtis for $17,553.94, prejudgment interest, and attorney's fees and costs.  Curtis answered and claimed that he could not, as a joint owner of the account, "convert" the funds for his own use.  He further asserted that SDCL 29A-6-104 barred the Estate's claims.

[¶9.]     During a trial to the court in January 2015, the parties stipulated to the admission of all exhibits, and Kathleen and Curtis testified.  They both testified that Jacquelyn opened the 1989 Account because Darrell could not manage money.  Curtis offered no definitive opinion to what he believed Jacquelyn intended when she placed his name on the account in 1989.  In response to questions from the court, Curtis testified as follows:

> **Court**:  The savings account was opened in 1989.  Correct?
> **Curtis**:  Yes.
> **Court**:  What was your understanding at the time it was opened, why was your name put on it?

**Curtis**: Because my mother had just inherited a large amount of money and she wanted somebody on there to - - in case anything happened to her, and she didn't want my dad's name on it.

**Court**: So suppose something happened to her the next day. What was your understanding as to what you were supposed to do with the money in there?

**Curtis**: We didn't really discuss what it was. I guess she trusted me - - I felt she trusted me to do what needed to be done.

**Court**: Would you think what needed to be done was for you to just take all the money then, at that point?

**Curtis**: No. I - - I may have been - - probably, when I look back on it in hindsight, I feel that it was naïve not to even ask about your name being put on a joint account. I mean, I've learned a lot from this trial - - or litigation process, if - - when you put somebody's name on a joint account, there's a significant right that that other person has to the account, should something happen to the original person.

**Court**: But my question really is, what was your understanding what you were to do with what was in that account if something happened to your mother?

**Curtis**: There hadn't been any discussion.

**Court**: So what would you have done if that had happened the next day?

**Curtis**: What would I have done with the money? Well, at that time, I probably would have talked to my brothers and sisters and tried to figure out - - my dad and figure out what we should do with the money. Because my understanding was it was quite significant at that time.

Curtis and Kathleen testified that they were unaware the 2007 Account was a joint account and that neither contributed money to the account balance at any time. Kathleen claimed that Jacquelyn told her that the money in the 2007 Account was to be distributed equally between her and her siblings after Darrell no longer needed support or care. Curtis claimed that Jacquelyn intended to create a joint account with right of survivorship because Jacquelyn had years of banking experience and had given money to her son Craig while she was still alive.

[¶10.] At the conclusion of the trial, the court directed the parties to submit proposed findings of fact and conclusions of law. The court remarked, "Well, as I sit here, I think that the core of this case is really around Paragraph 1 of 29A-6-104[.]" The court did not address the Estate's claim in its complaint that an implied trust existed. On January 30, 2015, the court issued findings of fact, conclusions of law, and a judgment. It ruled "[t]hat there has been clear and convincing evidence presented that Jacquelyn Card intended to create savings account number 3200001623 for her own convenience and not for the benefit of the non-depositing joint payees, Kathleen Card and Curtis Card." It further ruled that "[t]he circumstances and evidence presented establish that there was an inference that the decedent intended to transfer to Kathleen Card and Curtis Card bare legal title and not to convey the beneficial interest in savings account number 3200001623." The court held that Curtis "had no right to withdraw any funds from savings account number 3200001623 for his own personal enrichment." Therefore, it declared that Curtis "has a duty to convey any funds taken from savings account number 3200001623 back to the estate." The trial court ordered that "any money withdrawn by [Curtis] should be disgorged into the decedent's estate." It granted a judgment against Curtis in favor of the Estate for $17,553.94, plus prejudgment interest.

[¶11.] Curtis appeals and raises the following issues for our review:

1. Whether the trial court clearly erred when it held that the Estate met its burden of proof that Jacquelyn did not intend to establish a joint tenancy with right of survivorship.

2. Whether the trial court clearly erred when and if it held that the Estate met its burden of proof to establish that an implied trust existed and that a conversion occurred.

**Standard of Review**

[¶12.] "We review the [trial] court's findings of fact under the clearly erroneous standard of review." *Wiseman v. Wiseman*, 2015 S.D. 23, ¶ 6, 863 N.W.2d 243, 245.

> In applying the clearly erroneous standard, our function is not to decide factual issues de novo. . . . This Court is not free to disturb the lower court's findings unless it is satisfied that they are contrary to a clear preponderance of the evidence. Doubts about whether the evidence supports the court's findings of fact are to be resolved in favor of the successful party's "version of the evidence and of all inferences fairly deducible therefrom which are favorable to the court's action."

*Fin-Ag, Inc. v. Feldman Bros.*, 2007 S.D. 105, ¶ 19, 740 N.W.2d 857, 862-63 (quoting *Am. Bank & Trust v. Shaull*, 2004 S.D. 40, ¶ 11, 678 N.W.2d 779, 783) (internal citations omitted).

**Analysis**

[¶13.] Curtis avers that "[s]tatutory and case law make it clear that the [2007] account passes to the surviving joint tenants by operation of law." He further claims Kathleen admitted that the 2007 Account is a joint account with right of survivorship. Because he has not disclaimed his interest, Curtis argues he is legally entitled to his share. Although Curtis is correct—the 2007 Account is a joint account with right of survivorship—the issue in this case is whether the Estate rebutted the presumption of joint tenancy with clear and convincing evidence. *See* SDCL 29A-6-104; *In re Estate of Kuhn*, 470 N.W.2d 248, 250 (S.D. 1991).

[¶14.]    Under SDCL 29A-6-104(1), "[s]ums remaining on deposit at the death of a party to a joint account belong to the surviving party or parties as against the estate of the decedent unless there is clear and convincing evidence of a different intention at the time the account is created." The controlling inquiry is Jacquelyn's intent at the time she created the account. *See Barbour v. First Citizens Nat'l Bank*, 77 S.D. 106, 112, 86 N.W.2d 526, 529 (1957). However, "[i]t is not essential to the creation of a joint bank account with right of survivorship that the beneficiary depositor have knowledge of the account; that he have possession of the passbook; that he sign a signature card; or make withdrawals therefrom." *Id.* Nor should a party's rights "be jeopardized by the somewhat lax methods used by the bank in transacting its business and keeping its records." *Karlen v. Karlen*, 89 S.D. 523, 534, 235 N.W.2d 269, 275 (1975) (quoting *Equitable & Cent. Tr. Co. v. Zdziebko*, 244 N.W. 505 (Mich. 1932)). "However, these are all important factors and competent evidence bearing on the question of intention." *Barbour*, 77 S.D. at 113, 86 N.W.2d at 529.

[¶15.]    As the party challenging the presumption, the Estate must present clear and convincing evidence that Jacquelyn "did not intend the usual rights of survivorship to attach to the joint asset, but instead intended the arrangement for her own convenience." *See In re Estate of Steed*, 521 N.W.2d 675, 678 (S.D. 1994). "Whether the joint accounts in question were created by decedent for her own convenience or for the benefit of the nondepositing joint payees is a question of fact to be determined from all the facts and circumstances in the case." *Id.* We, therefore, review the trial court's determination that Jacquelyn did not intend to

create a joint account with right of survivorship for clear error. *See Estate of Kuhn*, 470 N.W.2d at 251. "The question is not whether this Court would have made the same findings that the trial court did, but whether, on the entire evidence, we are left with a definite and firm conviction that a mistake has been committed." *Id.* (quoting *Kirsch v. First Nat'l Bank*, 298 N.W.2d 71, 73 (S.D. 1980)).

[¶16.] From our review of the record and the trial court's findings of fact, we are not left with a definite or firm conviction that the court erred when it determined that Jacquelyn did not intend to create a joint account with right of survivorship in 2007. There is little evidence besides the signature card indicating a joint account with right of survivorship when compared to the more significant evidence that Jacquelyn intended to create the account for her convenience. Jacquelyn placed her inheritance in an account separate from Darrell to protect the funds from Darrell's inability to manage money.

[¶17.] Curtis does not dispute that Jacquelyn wanted to ensure the money's existence for Darrell's care and support. In his brief to this Court, Curtis merely invites us to reweigh the evidence and assess witness credibility. Yet "it is within the prerogative of the trial court to resolve conflicts of evidence, judge the credibility of witnesses, and weigh the testimony of witnesses." *Schieffer v. Schieffer*, 2013 S.D. 11, ¶ 22, 826 N.W.2d 627, 635; *In re Nelson Living Trust*, 2013 S.D. 58, ¶ 32, 835 N.W.2d 874, 884.

[¶18.] We decline to address Curtis's claim that the court's factual findings are clearly erroneous because the findings refer to Kathleen's testimony about "uncorroborated statements" made by Jacquelyn. Curtis did not object to these

statements when Kathleen testified. We also reject Curtis's assertion that the trial court ruled that the 1994 Will revoked the status of the 2007 Account as a joint account. The court considered the 1994 Will as evidence of Jacquelyn's intent when she opened the 2007 Account. Lastly, we need not address Curtis's argument that the court clearly erred "if" it determined that the Estate met its burden of proof that an implied trust existed. The trial court did not rule on the Estate's claim that an implied trust existed.

[¶19.] The Estate moved for $3,066 in appellate attorney's fees under SDCL 15-26A-87.3. SDCL 15-26A-87.3 authorizes an award of appellate attorney's fees when fees are awardable at the trial level. The Estate relies on SDCL 29A-3-720 as authorization for an award of attorney's fees. That statute provides:

> Any personal representative or person nominated as personal representative who defends or prosecutes any proceeding in good faith, whether successful or not, is entitled to receive *from the estate* necessary expenses and disbursements including reasonable attorney's fees.

*Id.* (emphasis added). The plain and unambiguous language of this statute authorizes an award of attorney's fees from *the estate,* not from *Curtis. See, e.g., In re Guardianship of G.T.C.*, 2014 S.D. 65, ¶ 8, 854 N.W.2d 343, 345 (interpreting similar statutory language and ruling that "the attorney for the guardianship and conservatorship was entitled to her fees from the estate rather than guardians and conservators personally"). The Estate directs this Court to no law authorizing an award of attorney's fees against Curtis at the trial level. We, therefore, deny the Estate's motion for an award of appellate attorney's fees against Curtis.

[¶20.] Affirm.

#27388

[¶21.]     GILBERTSON, Chief Justice, and ZINTER, SEVERSON, and KERN, Justices, concur.